IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TONY EUGENE SPENCER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:13-CV-00117 |
| | § | |
| CAROLYN W. COLVIN[1], | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[2] in this social security appeal is Defendant's Motion for Summary Judgment and Memorandum in Support (Document No. 15), Plaintiff's Motion for Summary Judgment and Memorandum in Support (Document No. 19), and Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment (Document No. 21). After considering the cross-motions for summary judgment, the administrative record, the written decision of the Court, and the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's Motion for Summary Judgment is GRANTED, Plaintiff's Motion for Summary Judgment is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for Michael J. Astrue as the defendant in this case.

[2] On August 2, 2013, pursuant to the parties' consent, this case was transferred by the District Judge to the undersigned Magistrate Judge for all further proceedings (Document No. 13).

## I.    Introduction

Plaintiff Tony Eugene Spencer ("Spencer") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying his applications for disability insurance benefits and for supplemental security income benefits ("SSI"). Spencer argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and that the ALJ, Donald Willy, committed errors of law when he found that Spencer was not disabled. Spencer argues that he has been disabled since June 30, 2004, due to sciatic pain, learning disability, memory loss, and leg screws. (Tr. 177). According to Spencer, the ALJ erred in finding that he did not meet or equal Listing 12.05(C), and committed further error in determining Spencer's residual functional capacity ("RFC") by not accounting for all of his alleged limitations. Spencer seeks an order reversing the ALJ's decision and awarding benefits, or in the alternative, remanding his claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Spencer was not disabled, that the decision comports with applicable law, and that the decision should, therefore, be affirmed.

## II.   Administrative Proceedings

On April 9, 2010, Spencer filed applications for disability insurance benefits and SSI, claiming an inability to work due to disability alleged to have begun on June 30, 2004. (Tr. 141-146). The Social Security Administration denied his applications at the initial and reconsideration stages. (Tr. 87-94; 99-105). Spencer then requested a hearing before an ALJ. (Tr. 106-107). The Social Security Administration granted his request, and the ALJ held a hearing on September 6, 2011. (Tr. 30-78). The ALJ issued his decision, finding Spencer not disabled. (Tr.

11-29). In his decision, the ALJ found that Spencer was not disabled at any time from June 30, 2004, through the date he issued his decision. (Tr. 25).

Spencer sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 7-10). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) there is a broad policy issue that may affect the public interest; or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence. 20 C.F.R. § 404.970; 20 C.F.R. § 416.1470. After considering Spencer's contentions, in light of the applicable regulations and evidence, the Appeals Council concluded that there was no basis upon which to grant Spencer's request for review. (Tr. 1-6). The ALJ's findings and decision then became final. Spencer has timely filed his appeal of the ALJ's decision (Document 1). The Commissioner has filed a Motion for Summary Judgment (Document No. 15). Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No. 19), to which the Commissioner has filed a response (Document No. 21). This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 638 (Document No. 10). There is no dispute as to the facts contained therein.

## III. Standard for Review of Agency Decision

The court's review of denial of disability benefits is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, U.S.C. Title 42, Section 405(g) limits judicial review of the Commissioner's

decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." The Act specifically grants the district court the power to enter judgment, upon pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record, nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decision." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, 174 F.3d at 693; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the burden of proving his disability. *Johnson*, 864 F.2d at 344. The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be so severe as to limit the claimant in the following manner:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A). The mere presence of impairment is not enough to establish that one is suffering from disability. Rather, a claimant is disabled only if he is "incapable of engaging in *any* substantial gainful activity." *Anthony*, 954 F.2d at 293 (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments [he] will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents [him] from doing any other substantial gainful activity, taking into consideration [his] age, education, past work experience and residual functional capacity, [he] will be found disabled.

*Id.*; *see also Leggett v. Chater*, 67 F.3d 558, 567 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *Id.* Once the Commissioner shows that other jobs are available, the burden shifts back to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990). If at any step in the process the Commissioner determines that the claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ determined that Spencer was not disabled at step five, because he retained the RFC to perform jobs that exist in significant numbers in the national economy. (Tr. 24). In particular, the ALJ determined that Spencer had not engaged in substantial gainful activity since June 30, 2004 (step one); that Spencer's degenerative disc disease, borderline intellectual functioning, and sciatica were severe impairments (step two); and that Spencer did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three). (Tr. 16-17). The ALJ determined that Spencer had the RFC to perform unskilled work at the medium exertional level. (Tr. 19). The ALJ further determined that although Spencer was incapable of performing his past work as a ditch digger or roofer (step four), he could perform jobs such as grounds keeper, laundry worker, and kitchen helper (step five), and was not disabled. (Tr. 23-25). As a result, the Court must determine whether substantial evidence supports the ALJ's findings.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren*, 925 F.2d at 126.

## V.   Discussion

### a.   Objective Medical Evidence

The objective medical evidence shows that Spencer suffers from three severe impairments: degenerative disc disease, borderline intellectual functioning, and sciatica.

On January 18, 1997, Spencer was taken to the Ben Taub Hospital Emergency Room. (Tr. 428). He was diagnosed with ethanol intoxication and opiate abuse. (Tr. 424). The physician prescribed Librium and referred Spencer to a drug and alcohol counselor. (Tr. 425). On October 6, 2009, Spencer reported that his polysubstance abuse was in remission for over a year. (Tr. 255). More specifically, he reported that his cocaine abuse was in remission for one year and his alcohol abuse for two years. *Id.*

On September 14, 2006, Spencer was treated at the Lyndon B. Johnson Emergency Room for what turned out to be a vasovagal episode. (Tr. 445-460). Upon admission, he reported that he was experiencing vertigo and had passed out two days prior. (Tr. 452). After an EKG, blood test, and physical examination, Spencer was discharged and instructed to return if he experienced a similar episode. (Tr. 451, 454-456). Based upon the medical records, the vasovagal episode appears to have been isolated and non-recurring.

Spencer went to the Lyndon B. Johnson Hospital Emergency Center on June 24, 2009, complaining of "on and off" chest pain occurring over the past 14 months, and "on and off"

lower back and leg pain occurring over the past two years. (Tr. 435). On a scale of 0-10, Spencer rated his pain as a "6." (Tr. 440). A history of hypertension and fracture repair in his right leg was noted. (Tr. 436). An EKG was performed and the results were normal. (Tr. 439). The record indicates that, upon arrival and discharge, Spencer had no problems with his gait and was able to ambulate without assistance. (Tr. 443, 438). Spencer was diagnosed with sciatica and prescribed Vicodin, naproxen, and Prednisone (Tr. 238, 438). Additionally, both lumbosacral and knee x-rays were ordered. (Tr. 237, 444).

The lumbosacral x-ray results, dated June 25, 2009, revealed no fracture or malalignment of the lumbar spine. (Tr. 241). The vertebral body and intervertebral disc height were preserved. *Id.* Degenerative changes with osteophyte formation and facet osteoarthritis from L3/4 to L5/S1 were noted. *Id.* No sclerotic or lytic changes were seen and an impression of "no acute abnormality" was recorded. *Id.* A knee x-ray taken the same day showed no fracture or dislocation in the left knee, with only mild degenerative changes present. (Tr. 242). Radiopaque density was noted in the anterior soft tissues of the distal thigh. No joint space or soft tissue abnormalities were present. *Id.*

Spencer went to the Health Spectrum Clinic on March 19, 2010, with a chief complaint of lower back pain. (Tr. 292). He reported his pain as a "6" out of "10," and also reported mild to moderate anxiety. (Tr. 299-300). His gait was recorded as "slow-guarded." (Tr. 292). Spencer was prescribed Lortab and Xanax, and was instructed to follow-up in one month. *Id.* Spencer returned to the Health Spectrum Clinic on April 22, 2010. (Tr. 284).  He reported his pain as a "3" out of "10" and reported mild improvement with his anxiety. (Tr. 293-294). The record indicates that Spencer's gait was within normal limits. (Tr. 284). Spencer's treatment plan included a continuation of the Lortab and a follow-up appointment in one month.

Dr. Arnold Carothers conducted a medical consultative examination on Spencer on March 11, 2011. (Tr. 331). Spencer's chief complaints included back pain, sciatic pain, leg screws, and weakness. *Id.* The examination revealed that Spencer had normal pinprick and vibratory sensation in all four extremities. (Tr. 333). His right knee showed mildly decreased flexion without crepitus or deformity. *Id.* Dr. Carothers noted that Spencer was able to ambulate without any difficulty. *Id.* Regarding Spencer's back, Dr. Carothers reported:

> There is no tenderness to palpation over the spinous process or the costovertebral angle. There is tenderness with palpation over the left S1 Joint and Piriformis muscle. There are no muscle spasms or tissue texture changes noted. Sitting straight leg raise is negative to 70 degrees bilaterally. The patient is able to squat to the ground and arise from a squatting position without any difficulty. He is able to forward bend and touch his toes.

(Tr. 333).

Dr. Carothers noted that Spencer fractured his leg at age 15 and was required to have "ORIF" (open reduction and internal fixation) of his right femur. Right knee radiographs dated March 11, 2011, revealed no joint effusion or focal soft tissue swelling. (Tr. 330). There was no gross evidence of hardware complications arising from Spencer's earlier leg surgery. *Id.* There was no other focal osseous or alignment defect demonstrated. Mild to moderate tricompartment degenerative disease was present. *Id.*

Spencer went to the El Franco Lee Clinic on June 29, 2011, complaining of hip and back pain. (Tr. 629). Spencer reported chronic, daily lower back pain and an inability to work due to pain and a lack of mobility. (Tr. 338). A lumbosacral x-ray was scheduled for July 7, 2011 and a lumbar spine MRI without contrast for August 21, 2011. (Tr. 338, 630). Dr. Afua Agyarko wrote an order for Motrin and Ultram. (Tr. 349).

The radiologist noted that Spencer's lumbosacral spine x-rays, dated July 7, 2011, revealed no fractures, subluxations, or bone abnormalities. (Tr. 402). Mild disc space narrowing

of the lower thoracic spine at L4-L5 and L5-S1 were visible. *Id.* Prominent multilevel anterior osteophytosis of the lumbar spine was observed, as well as facet hypertrophy from L4 to S1. *Id.* The radiologist recorded an impression of "moderate multilevel degenerative changes of the lumbar spine unchanged since 6/25/2009." (Tr. 403). Dr. Agyarko noted that the x-ray showed unchanged arthritis in the lower back, and instructed Spencer to return if the pain continued. (Tr. 404). The MRI results, dated August 22, 2011, revealed normal back structure with mild to moderate degenerative changes. (Tr. 338). There was moderate neuroforaminal stenosis that was worse on the right at L4/L5 due to moderate diffuse disc bulge and facet hypertrophy. (Tr. 339). Other mild degenerative changes were present with mild narrowing of the right neural foramina of L3/L4. *Id.*

On July 20, 2011, Spencer returned again to the El Franco Lee Clinic. (Tr. 394). He had previously attempted to donate blood and was informed by the blood center that he may have hepatitis C. *Id.* Spencer reported intermittent right upper quadrant pain and a history of drug abuse. (Tr. 619). The registered nurse noted that Spencer was "not in distress" and "ambulatory with normal gait." (Tr. 399). The nurse practitioner ordered a full panel of tests and imaging. (Tr. 620). The tests resulted in an official diagnosis of hepatitis C. (Tr. 372, 597).

Spencer went to the El Franco Lee Clinic on August 10, 2011, with complaints of lower back pain. (Tr. 604). Spencer reported that ibuprofen and Tramadol weren't helping control his pain. *Id.* Dr. Zainab H. Soumahoro referred Spencer to physical therapy and prescribed Feldene and Flexeril. (Tr. 344). A follow-up visit with Dr. Vu a Phung was scheduled for August 23, 2011. (Tr. 345).

On August 23, 2011, Spencer returned to the El Franco Lee Clinic for his follow-up appointment. Dr. Phung prescribed Naprosyn, Flexeril, and Vicodin. (Tr. 341-342). He was also

referred to physical therapy. (Tr. 342). Under "Impression & Plan," Dr. Phung noted "avoid heavy lifting (no more than 15 lbs)." (Tr. 362, 596).

Spencer returned on September 23, 2011 for prescription refills. (Tr. 591). He reported no pain, so Dr. Soumahoro discontinued the Flexeril, Naprosyn, and Vicodin. (Tr. 591-592).

Spencer also underwent a mental evaluation. (Tr. 250-257). On October 26, 2009, he was evaluated by Larry Pollock, PhD. Dr. Pollock administered both the Wechsler Adult Intelligence Scale-Third Edition ("WAIS-III") and the Wide Range Achievement Test-Fourth Edition ("WRAT4"). (Tr. 250). The results of the WAIS-III revealed a full scale IQ score of 66, a verbal IQ of 65, and a performance IQ of 74. (Tr. 255). The results of the WRAT4 revealed that Spencer's Word Reading ability was at the 1st grade level, Sentence Comprehension ability at the 2nd grade level, Spelling ability at the kindergarten level, and Math Computation ability at the 3rd grade level. (Tr. 253). Dr. Pollock rated Spencer with a GAF score of 60. (Tr. 256). He noted that Spencer "used his hands with normal dexterity" and "ambulated independently, his gait was normal." (Tr. 250). Dr. Pollock wrote:

> Appearance, Behavior, and Speech: Mr. Spencer looked his stated age. He was of average build. His hygiene and grooming were good.
>
> Behavior: Mr. Spencer was irritable, yet cooperative. He worked quickly and diligently. He was self-motivated and focused.
>
> Concentration: Mr. Spencer's concentration and attention span were fair. He recalled 5 digits forward and 2 digits in the reverse order of presentation. He was unable to spell WORLD forward or backward. He successfully counted backwards from 20.
>
> Communicative Abilities and Behavior: Mr. Spencer was irritable during the evaluation; however, he easily volunteered information. He was talkative and used a task-oriented approach during the testing.
>
> Thought Processes: Mr. Spencer's thought processes were goal oriented. He did not report auditory or visual hallucinations, and no suicidal or homicidal ideations.

(Tr. 252).

Here, substantial evidence supports the ALJ's finding that Spencer's degenerative disc disease, borderline intellectual functioning, and sciatica were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment. Likewise, substantial evidence supports the ALJ's finding that Spencer did not satisfy the requirements of 12.05(C).

Spencer contends that the ALJ erred in finding that Spencer failed to meet or equal the requirements of Listing 12.05(C) (mental retardation)[3]. In order satisfy the requirements of Listing 12.05(C), three specific requirements must be met. First, the claimant must satisfy the threshold requirement of the introductory sentence of Listing 12.05, namely that a claimant must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." *Randall v. Astrue*, 570 F.3d 651, 655-660 (5th Cir. 2009); 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.05. Second, the claimant must satisfy the first prong of the part (C) two-prong requirement—"[a] valid verbal, performance, or full scale IQ of 60 through 70." *Id.* Third, the claimant must satisfy the second prong of part (C)—claimant must have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

Here, Spencer maintains that he meets the criteria of Listing 12.05(C) because his full scale IQ is 66 (Tr. 255), and he has physical impairments (degenerative disc disease and sciatica) which impose significant additional limitations on his ability to do work related activities. Spencer relies on his testimony that he was enrolled in special education classes around the sixth

---

[3] Listing 12.05 has, as of February 2014, been changed from "Mental Retardation" to "Intellectual Disability." The substantive criteria for that Listing, however, remains the same.

grade to show that he had significantly subaverage intellectual functioning and deficits in adaptive behavior before age 22. (Tr. 36-37). However, Spencer indicated on his Disability Report Form SSA-3368 that he had *not* attended any special education classes. (Tr. 178). Moreover, Spencer could not provide any definitive testimony about his schooling:

> Q: What's the last grade of school that you completed?
>
> A: Special Ed in Jackson, Mississippi, sixth grade.
>
> ALJ: Sixth grade? Is that what you said? Sixth?
>
> CLMT: Sixth grade, I think.
>
> ALJ: Okay. Thank you.
>
> CLMT: A long time ago.
>
> Q: You finished it or you started sixth grade and didn't finish?
>
> A: It's kind of like, special ed grade I guess.
>
> Q: But did you complete the sixth grade?
>
> A: I probably did complete it.

(Tr. 36-37).

The Commissioner, in response to Spencer's argument that he meets Listing 12.05(C), points out that while Spencer does have IQ scores that fall within the "C" criteria and does have other physical impairments, he has made no showing, and there is no evidence in the record of onset of the impairment before age 22. *See e.g.*, *Parker v. Astrue*, Civil Action No. 11-294-SCR, 2012 WL 5384821 *4 (M.D. L.A. Nov. 1, 2012) ("the mere existence of IQ scores which satisfy the first part of paragraph C, along with a limited or special education" are insufficient, in and of themselves, to "demonstrate[] deficiencies in adaptive functioning initially manifested during the developmental period, that is, onset of the impairment before age 22"); *Potts v. Astrue*, Civil

Action No. H-12-cv-229, 2013 WL 5785659 *8 (S.D. Tex. Feb. 19 2013) (claimant's "poor performance in school, his past history as a special education student, and his illiteracy" are insufficient to meet his burden of establishing a "deficit in adaptive functioning" as required by Listing 12.05(C)). Additionally, the mental evaluations and assessments support the ALJ's findings that Spencer did not meet the criteria of Listing 12.05(C), and that Spencer retained the RFC for unskilled work.

Based on his clinical findings and testing, Dr. Pollock diagnosed Spencer with borderline intellectual functioning. (Tr. 253, 255). Notably, Dr. Pollock did not diagnose Spencer with either mental retardation or intellectual disability. Also, Dr. Pollock did not expressly state whether onset began prior to the age of 22 (as is required to satisfy Listing 12.05(C)). In his Psychiatric Review Technique, dated November 12, 2009, Dr. Mark Schade specifically indicated that Listing 12.05(C) was not satisfied, and like Dr. Pollock, diagnosed Spencer with borderline intellectual functioning. (Tr. 262). Furthermore, Dr. Schade specifically indicated that there was no evidence of onset prior to the age of 22. *Id.* Dr. Schade also noted that while Spencer "allege[d] limitations due to pain, he stated no significant mental limitations in daily activities, no problems with memory, concentration or completing tasks. Clmt able to shop, pay bills, drive, spend time woth [sic] others." (Tr. 270). In his Mental Residual Functional Capacity Assessment, dated November 12, 2009, Dr. Schade wrote, "[c]laimant can understand, remember, and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with coworkers and supervisors, and respond appropriately to changes in routine work settings." (Tr. 282).

Similarly, Dr. Lee Wallace noted in his Psychiatric Review Technique, dated September 17, 2010, that Spencer did not meet the requirements of Listing 12.05(C), but instead indicated

that borderline intellectual functioning was the appropriate diagnosis. (Tr. 305). Furthermore, Dr. Wallace noted in his Mental Residual Functional Capacity Assessment that "[claimant] can understand, remember, and carry out only simple instruction, make simple decision [sic], and respond to change [sic] in work settings". (Tr. 317).

The mental evaluation by Dr. Pollock, along with the opinions of Dr. Schade and Dr. Wallace, substantially support the ALJ's decision that Spencer did not satisfy the requirements of 12.05(C), but instead suffered from borderline intellectual functioning.[4] Upon this record, the ALJ's finding that Spencer retained the RFC for unskilled work is consistent with the medical evaluations and treatment records. Furthermore, the ALJ provided specific reasons in support of his determination. This factor weighs in favor of the ALJ's decision.

### b.  Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. Unless good cause is shown to the contrary, "the opinion, diagnosis and medical evidence of the treating physician, especially when the consultation has been over a considerable length of time, should be accorded considerable weight." *Perez v. Shweiker*, 653 F.2d 997, 1001 (5th Cir. 1981). For the ALJ to give deference to a medical opinion, however, the opinion must be more than conclusory and must be supported by clinical and laboratory findings. *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985); *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981). Indeed, "[a] treating physician's opinion on the

---

[4] *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 41-42 (4th ed. Rev. 2000) (DSM-IV-TR) ("Thus, it is possible to diagnose Mental Retardation in individuals with IQ's between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning . . . . Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation.").

nature and severity of a patient's impairments will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (quoting *Martinez v. Chater*, 64 F.3d 172, 176 (5th Cir. 1995)).

There are several medical opinions in the record, including the opinion of Spencer's treating physician, the opinions of medical experts who reviewed Spencer's medical records, and the opinions of physicians who consultatively examined Spencer.

Spencer contends that the ALJ erred by not giving controlling weight to the opinion of treating physician, Dr. Vu a Phung, that Spencer "avoid heavy lifting (no more than 15 lbs)." (Tr. 596). Although the opinions of treating physicians are to be given considerable weight, "'[T]he Commissioner is free to reject the opinion of any physician when the evidence supports a contrary conclusion.'" *Martinez*, 64 F.3d at 176 (quoting *Bradley v. Bowen*, 809 F2d 1054, 1057 (5th Cir. 1987)). Furthermore, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. Here, the ALJ relied heavily upon the examining and reviewing physicians, along with other objective medical evidence.

Dr. Oguejiofor, the medical expert ("ME"), testified at the administrative hearing that he believed that Spencer could function on the medium exertional level and that Spencer could lift 20 pounds and up to 50 pounds occasionally. (Tr. 65). Dr. Oguejiofor also testified that he believed that Spencer could ambulate over a period of time, had no manipulative difficulties, and didn't require a sit/stand option. (Tr. 65-66). In providing his expert testimony, Dr. Oguejiofor acknowledged Spencer's ORIF on his previously fractured right leg and his history of back pain.

(Tr. 63, 65-66). Dr. Oguejiofor further testified that Spencer did not meet Listing 1.04 because Spencer showed no atrophy, loss of power, or radiculopathy. (Tr. 66).

Dr. Randal Reid conducted a Physical Residual Functional Capacity Assessment of Spencer on November 12, 2009. (Tr. 272-279). He assessed Spencer as being able to frequently lift and/or carry 25 pounds and occasionally lift and/or carry 50 pounds. (Tr. 273). Later, on September 24, 2010, Dr. James Wright provided the same assessment of Spencer's carrying/lifting ability in another Physical Residual Functional Capacity Assessment. (Tr. 320). Dr. Wright noted that Spencer's "alleged limitations not fully supported by mer in file". (Tr. 324). The ALJ also relied upon Dr. Carothers' Consultative Examination, dated March 11, 2011. The ALJ wrote:

> Likewise, objective evidence of record fails to show any findings or observations consistent with disabling back pain. August 2011 treatment notes revealed moderate L4/L5 stenosis due to moderate disc bulge and facet hypertrophy and other mild degenerative changes with mild narrowing at the right neural foramina L3/L4 were noted. (Exhibits 15F3 and 17F9). Despite these findings, there is no indication from treating sources that they were disabling or caused physical limitations that precluded work. A March 2011 physical examination showed some tenderness with palpation over the left S1 joint and Piriformis muscle; however, there was no evidence of muscle spasms and straight leg raising was negative to 70 degrees. (Exhibit 13F4).
>
> Moreover, the record indicated, DDD notwithstanding, the [sic] he retained the ability to ambulate independently and without difficulty, bend forward and touch his toes, squat to the ground and arise without difficulty, walk on both his heels and toes, maintain normal gait, drive, play with his dogs, and sit long enough to watch his television programs. (Exhibit 2F1, 2F2, and 13F4). Neurological testing and testing of his extremities were all essentially normal. (Exhibit 13F4).
>
> The objective and clinical evidence that supports the claimant's finding of sciatica; however, there is no evidence or treating source opinion that this condition is disabling or ruinous to an ability to sustain full-time work activity.

(Tr. 22).

The ALJ properly acted within his purview in deciding not to give controlling weight to Dr. Phung's opinion that Spencer avoid heavy lifting. The Court concludes that the diagnosis and expert opinion factor supports the ALJ's finding that Spencer retained the RFC for unskilled work at the medium exertional level. The ALJ's decision is a fair summary and characterization of the medical records and medical expert testimony. The diagnosis and expert opinion factor also supports the ALJ's decision.

### c.   Subjective Evidence of Pain

The third element considered is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain. Statements made by the individual or his physicians as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-619 (quoting *Harrell v. Bowen*, 862 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task

particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Spencer testified at the hearing before the ALJ that he believes that he cannot do work for anyone and that he simply cannot function anymore. (Tr. 60). He offered no testimony or corroboration from his family or friends with respect to his complaints about his condition. He reported that he completed the sixth grade, attended special education classes, and lacked short term memory. (Tr. 36-38, 43, 54).

Spencer also testified that he regularly experiences back pain, cramps in his leg, and numbness and tingling in his foot. (Tr. 38). He reported that his back pain was so severe at times that he was forced to remain in bed and couldn't even arise to go to the bathroom. (Tr. 39). He further reported that when the pain was less severe, he had to crawl or hop to the bathroom. (Tr. 39, 48). Spencer testified that he experiences extreme pain in his leg that he believes contributes to his back pain. (Tr. 41). He reported the pain in his leg as so severe that he had contemplated cutting it off. (Tr. 47). Spencer further reported that he regularly experienced sleepless nights, and instead slept during the day due to his blurry vision. (Tr. 42). He reported constant tiredness and a lack of energy. (Tr. 46). When asked by the ALJ if he could handle a job that allowed for either sitting or standing, Spencer replied that he would "fall asleep on it." (Tr. 60). However, Spencer has not reported his sleep problems to the doctor. (Tr. 46). He testified that he's bedridden for three to four months during the winter time and not functional for three to four days a week during the summer (Tr. 48-49). Spencer also reported frequent headaches. (Tr. 41).

Spencer further testified that he is unable to lift more than 25 pounds and can stand for at most "30 minutes to an hour". (Tr. 49-50). He reported difficulty walking, bending at the waist,

stooping, twisting his upper body, squatting, and kneeling. (Tr. 51-53). Spencer claimed that he

could only climb a single flight of stairs and has trouble gripping with his hands. (Tr. 52-53).

ALJ Willy found Spencer's complaints and subjective symptoms not entirely credible. In

doing so, the ALJ wrote:

> The claimant testified that he was unable to work because of several mental and
> physical impairments. According to his testimony, he was unable to stand for
> more than 30 minutes, walk to [sic] far, or lift more than 25 pounds. He said he
> was unable to kneel, bend, climb stairs, drive, or hold onto things consistently. He
> said his condition was so severe that he had to lie down throughout the day. He
> said he occasionally was unable to stand and would have to crawl to the
> bathroom. He said he took 10 Tylenols [sic] in the morning to deal with his pain.
> He said he did not have any energy. However, he acknowledged that he played
> with his grandkids, sat on the porch, walk [sic] to a nearby store for cigarettes,
> bathe [sic] and groom [sic] himself, and watch [sic] his grandkids.
>
> Dr. Oguejiofor testified that the claimant's alleged problems with his hands, back
> pain, and buttocks pain was [sic] not documented. He noted that the consultative
> examination revealed normal upper extremities. He said the claimant's testimony
> that he needed a cane was not consistent with records that revealed and [sic]
> ability to ambulate without difficulty. He said there were no objective findings
> consistent with the criteria for listings 1.02 or 1.04. He stated the claimant alleged
> a variety of symptoms undocumented by medical records. For example, the
> claimant is positive for hepatitis C; however, there is no record of treatment or
> hospitalizations and recent liver function tests were normal. He opined that the
> claimant was capable of performing a full range of work at the medium exertional
> level.
>
> Dr. Sternes testified that the claimant did not meet the criteria for listings 12.04 or
> 12.05 because there was no evidence that demonstrated or supported an onset
> before age 22. He said the claimant's primary problem was understanding what he
> was told to do. Accordingly, he said the claimant was better suited for unskilled
> work that required the accomplishment of simple things only. He said the
> claimant would have no problems adapting to change in the work setting or
> interacting appropriately with others. Dr. Sternes noted the record indicated
> substance abuse in remission (alcohol 2 years and cocaine 2 year) [sic] and was
> not a contributing factor.
>
> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms; however, the claimant's statements concerning the
> intensity, persistence and limiting effects of these symptoms are not credible to
> the extent they are inconsistent with the above residual capacity assessment.

(Tr. 20-21).

Spencer contends that the ALJ failed to include all of his alleged limitations in the RFC determination. However, credibility determinations, such as made by the ALJ in connection with Spencer's testimony about his limitations, are within the province of the ALJ to make. *See Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly.'") (quoting *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985). Because the ALJ made and supported his credibility determination with references to medical evidence and Spencer's testimony about his daily activities, and because the ALJ did not rely on any improper factors, the subjective evidence factor also weighs in favor of the ALJ's decision.

### d.  Age, Education, and Work History

The final element to be weighed is the claimant's educational background, work history, and present age. A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

"A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1999) (quoting *Fields v. Bowen* 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it

incorporates the impairments which the ALJ has recognized to be supported by the whole record. *Id.* Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The record shows that Spencer was 50 years old at the time of the administrative hearing (Tr. 24, 32), had no educational or vocational degree, and had performed past relevant work as a ditch digger and roofer (Tr. 74). At the hearing, The ALJ questioned Tierney Nielson, a vocational expert ("VE"), about McCartney's ability to engage in gainful work activities:

Q: Is there any past relevant work?

A: I have him down as a ditch digger, which was very heavy, unskilled, and a roofer, he said he supervised on several people but he still performed it, it was heavy, four, semi-skilled.

Q: I take it he cannot do his past relevant work and there are no transferable skills?

A: That's correct.

Q: What do you have at medium, unskilled that he could perform, given the two residual function capacities that have been identified here. [sic]

A: In the medium, there was [sic] no limitations correct?

[INAUDIBLE]

Q: That's what he told me.

A: Okay. The medium unskilled would be such as groundskeeper, 406.687-010, 38,000 in Texas, 690,000 nationwide. A laundry worker, 361.687-018, medium, unskilled, 28,000 in Texas, 408,000 nationwide. Kitchen helper, 318.687-018, medium, unskilled, 35,000 in Texas, 780,000 nationwide, and that's a representative sample taken from the dictionary of occupational titles.

Q: If I take the claimant's testimony he's probably at less than sedentary, is he not?

A: That's correct.

Q: And if is [sic] in fact at sedentary, he would grid at age 50.

A: That's correct.

Q: All right so the only issue would be if there are any light jobs that he could perform where he could perform a full range of light work, is that correct?

A: Yes.

Q: And are there any that you can identify?

A: Yes. Meeting that same hypothesis - - an office cleaner, 323.387-014, light, unskilled, 15,000 in Texas, 380,000 nationwide; laundry worker 363.685-026, light, unskilled, 6500 [sic] in the state of Texas, 200,000 nationwide; and we'll just say an office cleaner, 323.687-014, light, unskilled, 15,000 in Texas, 380,000 nationwide and that's a representative sample of light unskilled that would meet that hypothesis.

Q: What are other vocational issues here that you've identified in your review of the file that I need to understand in order to attempt to decide this case?

A: Well, his ability to complete a task.

Q: Okay. And the doctor is saying that he can do that, the issue I guess is there's a contradiction between him and the two reports I have.

A: Yes.

Q: Anything else?

A: His reliability.

Q: Okay, and he's claiming that he can't do it in two or three days and I don't know whether anybody has spoken on that.

ALJ: have you spoken on that, Dr. Stern?

PE: No sir.

ALJ: Well, what's the issue on reliability?

PE: I have nothing to contradict that he couldn't be reliable.

ALJ: Okay, so it's just his testimony versus the lack of evidence.

PE: Okay.

Q: Anything else?

A: No, sir.

Q: All right. The information that you gave me about everything is form the DOT and its supplements?

A: Yes.

Q: And the information on the numbers of jobs is from the department of labor?

A: Yes, sir.

Q: Your opinions are based upon your having placed people into jobs that have hypothetical disabilities in the national economy?

A: Yes, sir.

(Tr. 73-76). The ALJ then allowed Spencer's counsel to question the VE. (Tr. 77). Based on counsel's questions, the VE testified that if the hypothetical client missed three or more days of work a month, that the hypothetical client would be unable to maintain employment. *Id.* Furthermore, the VE testified that if the hypothetical client was unable to remain on task for 20 percent or more of the work day, that the hypothetical client would be unable to maintain employment. *Id.*

Given the ALJ's reliance on the consulting ME, the ALJ's credibility determination relative to Spencer's testimony about his pain and limitations, and responses by the VE regarding the hypothetical questions posed by the ALJ, substantial evidence supports the ALJ's conclusion that Spencer is not disabled within the meaning of the Act. Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI.  Conclusion and Order

Considering the record as a whole, the Court is of the opinion that the ALJ and the Commissioner properly used the guidelines propounded by the Social Security Administration, which directs a finding that Spencer was not disabled within the meaning of the Act, that substantial evidence supports the ALJ's decision, and that the Commissioner's decision should be affirmed. As such, it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 19) is DENIED, Defendant's Motion for Summary Judgment (Document No. 15) is GRANTED, and the decision of the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this _18th_ day of _June_____, 2014

_____

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE